ANTHONY S. EARL, Secretary Department of Natural Resources
You have asked questions concerning the authority of the Department of Natural Resources under current law to regulate public and private activity on "wetlands." Your questions can be rephrased into three basic questions:
 1) Does the Department have authority to adopt rules which establish a wetlands activity permit program under the broad authority granted the Department in light of rejection in previous legislative sessions of amendments to the statutes governing the Department's powers which would have created a wetlands activity program requiring permits for some or all of the following:
 a) Draining, flooding, dredging, excavation, removal of soil, mud, sand, gravel or other aggregate from any marsh.
 b) Dumping, filling or depositing of any soil, stones, sand, gravel, mud, rubbish, or fill of any kind either directly or indirectly.
 c) Erecting any structures other than duck blinds. *Page 265 
d) Constructing roads or driving pilings.
e) Discharging pollutants into a marsh.
 f) Any other activity which impairs the natural functions of marshes.
 2) Does the Department have authority to adopt a wetlands activity, acquisition, and preservation program not involving permits per se and how does such a program relate to other departmental programs?
 3) Does the Department have the authority, by rule, to define the word "marsh" which occurs in sec. 144.01 (1), Stats., by adopting a definition such as "Marsh — a marsh is an area where groundwater is at or near the surface much of the year or where any segment of plant cover is defined as `aquatic' according to N.C. Fassett's Manual of Aquatic Plants," or defining "marsh" using the definition of "wetlands" contained in sec. NR 1.95 (3), Wis. Adm. Code?
As background, of an estimated 10 million acres of wetlands in Wisconsin's presettlement days, about 2.5 million acres remain. Approximately 1.6 million acres of these wetlands are privately owned.[1] Your staff informs me that more than 80% and perhaps as much as 90% of these wetlands are dissociated from navigable waters in the sense that there is no direct surface water connection at any time during the year.
You note that your Department has been presented with a petition for the adoption of wetlands management rules and that your Department has already adopted Wis. Adm. Code sectionNR 1.95, entitled "Wetland preservation, restoration and management." This section defines wetlands as "those land areas characterized by surface water or saturated soils during at least part of the growing season such that moist soil vegetation or shallow water plants can thrive." Section NR 1.95 (4) directs DNR to emphasize wetlands in its land acquisition program, preserve "by every lawful means" wetlands already under departmental control, and support legislative and cooperative efforts *Page 266 
to maintain Wisconsin's other wetlands. Section NR 1.95 (5) further directs DNR to "fully exercise all of its authority under the law to . . . [p]rotect wetlands from all environmentally incompatible uses, activities and substances," and to "[r]estore wetlands which were unlawfully altered."
Two observations must precede a discussion of DNR's wetlands management authority. First, power to regulate publicly owned lands must be distinguished from power to regulate privately owned lands. Section 23.11 (1), Stats., empowers DNR to:
 [T]ake the general care, protection and supervision of all . . . lands owned by the state or in which it has any interests, except lands the care and supervision of which are vested in some other officer, body or board; and said department is granted such further powers as may be necessary or convenient to enable it to exercise the functions and perform the duties required of it by this chapter and by other provisions of law.
Presumably, sec. 23.11 (1), Stats., vests DNR with power to prevent harm to and restore state-owned wetlands in the exercise of its discretion. Your concern, then, relates to DNR authority over privately owned lands and not public lands which DNR may now own or acquire in the future.
Second, we are dealing with what has traditionally been characterized as land, even though some of this land may be periodically covered with water.
1. PERMIT PROGRAM
Your first question, as rephrased, asks whether the Department has authority to adopt rules which establish a wetlands activity permit program. If your Department has the authority to adopt such a program, that authority must derive from either the statutes or the constitution.
A. The Statutes
An administrative agency has no power except those "powers which are expressly conferred or which are fairly implied from the four corners of the statute under which it operates." State(Dept. of Administration) v. ILHR Dept., 77 Wis.2d 126, 136,252 N.W.2d 353 (1977). This maxim is stated another way in sec. *Page 267 
227.014 (2) (a), Stats., authorizing agency rules "necessary to effectuate the purpose of the statutes, but such rules are not valid if they exceed the bounds of correct interpretation." Seealso: American Brass Co. v. State Board of Health, 245 Wis. 440,451, 15 N.W.2d 27 (1944); Josam Manufacturing Co. v. State Boardof Health, 26 Wis.2d 587, 601, 133 N.W.2d 301 (1965); Mid-PlainsTelephone, Inc. v. Public Service Commission, 56 Wis.2d 780,786, 202 N.W.2d 907 (1973); Wisconsin's Environmental Decade,Inc. v. Public Service Comm., 69 Wis.2d 1, 16, 230 N.W.2d 243
(1975).
The Legislature has obviously given the Department broad control over the "waters of the state." Sec. 144.025 (2) (a), Stats. The Legislature has defined "waters of the state" to include "marshes . . . and other surface or ground water, natural or artificial, public or private." Sec. 144.01 (1), Stats. In sec. 144.025 (1) the Legislature has stated that the purpose of the chapter is "to grant necessary powers and to organize a comprehensive program . . . for the enhancement of the quality management of all waters of the state, ground and surface, public and private." The Legislature, in the same section, also directs that rules and orders promulgated by your Department are to be "liberally construed in favor of the policy objectives of [the] act."
In the operative sections of ch. 144 no express mention is made of a wetlands activity permit program per se. There is, however, a mosaic of sections from which it might be argued that authority for such a program may be inferred. Under sec. 144.025 (2)(b), for example, the Department is authorized to adopt rules establishing water quality standards for waters of the state. Section 144.025 (2)(c) empowers the Department to issue general orders and adopt rules relating to systems, methods and means for avoiding pollution of the waters of the state. Finally, the Department has authority under sec. 144.025 (2)(d) to issue special orders requiring particular owners to achieve specified results toward controlling pollution of the waters of the state. Waters of the state include "marshes." Sec. 144.01 (1), Stats.
"Pollution" is defined in sec. 144.01 (11) to include "contaminating or rendering unclean or impure the waters of the state [including `marshes'] or making the same injurious to public health, harmful for commercial or recreational use, or deleterious to fish, bird, animal or plant life." *Page 268 
Moreover, other sections of the statutes explicitly grant DNR extensive authority in water management matters, some of which authority is not presently exercised to the fullest extent: the navigable waters protection law, sec. 144.26, Stats.; flood control, ch. 87, Stats.; DNR approval procedure for drainage district activities affecting navigable waters, sec. 88.31, Stats.; the extensive enumeration of water pollution control measures in ch. 144, Stats., and Wisconsin's Pollutant Discharge Elimination System, ch. 147, Stats., to name a few. [n addition, the definition of "navigability" undoubtedly encompasses areas which may appropriately be defined as "marsh" to bring them within the reach of chs. 30 and 31, Stats.
None of these statutes, however, can be construed as an explicit directive to the Department to establish an overall wetlands activity permit program. In the absence of an express grant of authority, the question of what powers may be "fairly implied" by an enabling statute must be addressed in light of the maxim that such statutes are to be "strictly construed to preclude the exercise of power which is not expressly granted,"Browne v. Milwaukee Board of School Directors, 83 Wis.2d 316,333, 265 N.W.2d 559 (1978); Racine Fire and Police Commission v.Stanfield, 70 Wis.2d 395, 399, 234 N.W.2d 307 (1975). And, if doubts remain, "any reasonable doubt of the existence of an implied power of an administrative body should be resolved against the exercise of such authority." State ex rel. Farrell v.Schubert, 52 Wis.2d 351, 358, 190 N.W.2d 529 (1971).
Keeping these basic principles of statutory construction in mind, State (DOA) v. ILHR Dept., supra, is particularly instructive in determining what powers may fairly be implied from sec. 144.025, Stats. The issue in that case was whether the director of the State Bureau of Personnel had exceeded his delegated authority by promulgating administrative rules which authorized absolute preferences for hiring women and minorities in state civil service. The rules were promulgated pursuant to sec. 16.08 (7), Stats., which permitted the director to provide by rule for "exceptional methods" to employ the disadvantaged. Finding no express statutory grant of authority for the challenged rule, the supreme court then examined sources of implied power to use absolute hiring preferences. The court found no such implication arising from sec. 16.08 (7), Stats., or any other statute, and declared the rules void ab initio, stating: *Page 269 
 We conclude a grant of power to implement absolute preferences based upon sex or race is not implied by the language of sec. 16.08 (7) or because the appellants claim such preferences are the only feasible method to accomplish the legislative purpose. Furthermore, other statutes contain statements which are clearly not consistent with the grant of such a power, and therefore there is at minimum a reasonable doubt of the existence of implied power to implement the drastic procedures of absolute preferences. Where such a reasonable doubt exists, that doubt must be resolved against the implied grant.
State (Dept. of Administration) v. ILHR Dept., 77 Wis.2d at 140.
In my opinion at least four sources of reasonable doubt contravene any implied DNR power to establish by rule the proposed wetlands activity permit program. First, other statutes establishing permit programs enacted to protect the state's water quality suggest that where the Legislature has intended to bestow regulatory authority upon DNR, it has expressly done so. Foremost among these regulatory mechanisms is ch. 147, Stats., Wisconsin Pollutant Discharge Elimination System. Chapter 274, Laws of 1977, did grant the Department authority to map wetlands, but this delegation of power falls short of the permit program contemplated in your request.
Second, the enumeration of powers granted to DNR in sec. 144.025 (2)(a) through (t), Stats., emphasizes by exclusion that if the Legislature had intended to vest DNR with power to require permits for alterations to wetlands, it would have done so. InState ex rel. Harris v. Larson, 64 Wis.2d 521, 527,219 N.W.2d 335 (1974), this principle was stated as follows:
 Where there is evidence of such enumeration [of agency powers], it is in accordance with accepted principles of statutory construction to apply the maxim, expressio unius est exclusio alterius; in short, if the legislature did not specifically confer a power, it is evidence of legislative intent not to permit the exercise of the power.
Third, and most persuasive, the Legislature's previous rejection of wetlands activity permit legislation negates the existence of an implied legislative delegation of such authority to DNR. The Legislature rejected proposed wetlands protection programs in 1973 and 1975. Only the wetlands mapping bill survived the 1977 legislative *Page 270 
session. The Legislature's repeated rejection of wetlands activity permit legislation in 1973, 1975 and 1977 speaks for itself.
In 1968, your predecessor requested my opinion on the statutory authority of the conservation commission to limit by rule the number of hunters in any given area. Noting that successive legislative sessions from 1949 to 1967 had rejected bills authorizing the commission to adopt controlled hunting regulations, I stated:
 The fact that the legislature has seen fit to specifically authorize controlled hunting in several instances (i.e., sec. 29.107, 29.174 (2)(b), 29.571, Stats.) is in consistent with the view that secs. 23.09 and 29.174, Stats., repose this power in the commission. The legislature is, after all, presumed to have full knowledge of the existing condition of the law when it acts. Town of Madison v. City of Madison, (1955) 269 Wis. 609, 70 N.W.2d 249.
57 Op. Att'y Gen. 31, 35, 36 (1968).
We must presume that when the Legislature refuses to delegate wetlands management authority, it is well aware of the extent of DNR's powers in this area and simply intends not to grant additional authority. Ford v. Wisconsin Real Estate ExaminingBoard, 48 Wis.2d 91, 109, 179 N.W.2d 786 (1970); Cook v.Industrial Commission, 31 Wis.2d 232, 243, 142 N.W.2d 827
(1966). Wisconsin's Environmental Decade v. Public ServiceCommission, 81 Wis.2d 344, 351, 260 N.W.2d 712 (1978), adds this caveat:
 Public agencies are granted a great deal of latitude in regulatory matters, because of the expertise of the agencies. However, actions of the agency will not be allowed to prevail when they conflict with the legislative history or intent. Moreover, decisions of an agency like the present one, which deal with the scope of the agency's own power, are not binding on this court.
Finally, the best argument against the adoption by rule of a wetlands activity permit program is that you have not done so though the arguable power to do so has existed and your practical construction of the statute, in this case by inaction, would likely, along with the other factors mentioned above, be given great weight in any court test of your powers. I believe you had a fighting chance of sustaining your power to adopt such a program if you had acted on my informal *Page 271 
advice that I would defend the Board and the Department if you did so. In the absence of action on your part, I am constrained to answer the theoretical question concerning your statutory power in the negative.
B. The Constitution and the Public Trust Doctrine
Because the statutes do not authorize a wetlands activity permit program, we must determine whether the public trust doctrine provides an independent basis for the adoption of such a program.
The public trust concept is rooted in Wis. Const. art. IX, sec.1, which reads exactly as the provision in the Northwest Ordinance of 1787 regarding navigable waters:
 JURISDICTION ON RIVERS AND LAKES; NAVIGABLE WATERS. SECTION 1. The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.
The significance of the Northwest Ordinance is that northwest territory lands, including Wisconsin, were ceded to the union only on condition that the navigable waters within them remain "common highways and forever free." The state's obligation to protect its waterways, then, began at statehood and continues as a constitutional limitation on public and private use of navigable waters within Wisconsin. See Muench v. Public ServiceCommission, 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40 (1952).
Earliest Wisconsin cases characterize the state's ownership in navigable waters as a public trust to be administered for the benefit of the people of Wisconsin. Walker v. Shepardson,4 Wis. 495 (1856); Olson v. Merrill, 42 Wis. 203 (1877); McLennan v.Prentice, 85 Wis. 427, 55 N.W. 764 (1893); Priewe v. Wis. StateLand and Improvement Co., 93 Wis. 534, 67 N.W. 918 (1896);Village of Pewaukee v. Savoy, 103 Wis. 271, 79 N.W. 436 (1899);Illinois Steel Co. v. Bilot, 109 Wis. 418, 84 N.W. 855 (1901);Diana Shooting Club v. Husting, *Page 272 156 Wis. 261, 145 N.W. 816 (1914); Muench v. Public ServiceCommission, supra; and Wisconsin's Environmental Decade, Inc. v.DNR, 85 Wis.2d 518, 271 N.W.2d 69 (1978).
Although the early cases stressed the state's responsibility to protect navigable waters for commerce, the Wisconsin Supreme Court over the years has expanded the range of public rights in navigable waters beyond commercial navigation to include recreational uses. Nekoosa-Edwards Paper Co. v. Railroad Comm.,201 Wis. 40, 46, 228 N.W. 144, 229 N.W. 631 (1930); Muench v.Public Service Comm., supra. The definition of "navigable" has similarly broadened so that a stream is navigable in fact if capable of floating a craft of the shallowest draft for recreational purposes; moreover, the stream need not even be navigable year round, since "the test is whether the stream has periods of navigable capacity which ordinarily recur from year to year, e.g., spring freshets, or has continued navigable long enough to make it useful as a highway for recreation or commerce." DeGayner Co. v. DNR, 70 Wis.2d 936, 945, 946,236 N.W.2d 217 (1975).
What has not changed, however, is the principle that the Legislature, not state agencies, administers the trust. Milwaukeev. State, 193 Wis. 423, 449, 214 N.W. 820 (1927).
The Legislature may delegate some of its trust duties to administrative agencies and governmental units, and has done so.See, for example chs. 30 and 31, Stats., concerning structures, alterations and activities upon navigable waters; ch. 33, Stats., public inland lake protection and rehabilitation; ch. 88, Stats., drainage districts; and ch. 92, Stats., soil and water conservation districts. Because the Legislature is the trustee, however, any delegation of trust responsibilities must come from the Legislature. Those trust responsibilities cannot be created or assumed by an administrative agency, no matter how meritorious the purpose. It is precisely that lack of legislative direction that prohibits DNR's exercise of trust powers to regulate privately owned wetlands, as has been discussed above.
Historically, the trust doctrine has been a basis along with the police power for state regulation of waters. Just v.Marinette County, 56 Wis.2d 7, 201 N.W.2d 761 (1972). However, it has never been used to create a power in any agency not already clearly residing in that agency. This is not to suggest that should the Legislature grant *Page 273 
express power for a wetlands activity program to DNR that the trust doctrine would be irrelevant; indeed, I believe that the public trust doctrine would provide strong support for such a program once enacted.
II. NON-PERMIT PROGRAMS
You have also asked me about non-permit programs and other powers. I have already pointed to some of these powers above. While I have concluded that no wetlands permit program authority exists per se there appears to be broad non-permit authority in the Department to acquire, preserve, and protect wetlands. In addition, permit programs which are not specifically directed at wetlands but which affect such wetlands directly and indirectly could be administered so as to grant substantial amounts of protection to this portion of the "waters of the state."
For example, Wis. Adm. Code section NR 151.12 (4)(f) prohibits the location of solid waste sites in wetlands. Similarly, sec.88.31, Stats., regulating drainage district activities affecting navigable waters, and chs. 30 and 31, regulating structures and activities in navigable waters could be administered to prevent or at least minimize damage to wetlands by prohibiting or regulating drainage, fills and drawdowns detrimentally affecting wetlands. Although the Department has not so administered the statutes I am also convinced that filling wetlands falls in many instances within the definition of pollution of "waters of the state," and rules and special orders under sec. 144.025 (2)(c) and (d) and ch. 147, Stats., could be used to regulate at least some of such activity. Finally, there are wetlands which directly affect water quality in connected or adjacent navigable waters where water quality standards set for the navigable body could be used to regulate activity in the related wetlands. NR 1.95 is, in itself, a step in this direction.
III. DEFINITIONS
Finally, you ask about the authority to define "marsh." The short answer is that an administrative agency always has the power to define terms to give substance to the powers delegated to it by the Legislature as long as the definition does not "exceed the bounds of correct interpretation," sec. 227.014 (2)(a), Stats.; State v. Grayson, 5 Wis.2d 203, 210-211,92 N.W.2d 272 (1958). I would consider that either of the definitions proposed would be within your discretion *Page 274 
and that you could go further, depending on the purpose of the program, to define "marsh" or "wetland" to exclude areas of less than a certain size from such definition.
BCL:DJH:MS
[1] "Wetland Use in Wisconsin: Present Policies and Regulations," Wisconsin Department of Natural Resources (1976), p. 5.