JOSAM MANUFACTURING COMPANY, Respondent, v. STATE BOARD OF HEALTH, Appellant.

*February 3—March 2, 1965.*

For the appellant the cause was argued by *James H. McDermott,* assistant attorney general, with whom on the original brief was *George Thompson,* attorney general, and on the reply brief was *Bronson C. La Follette,* attorney general.

For the respondent there was a brief by *Mount & Keck* of Milwaukee, and oral argument by *Herbert L. Mount.*

BEILFUSS, J. The defendant-appellant, Board of Health, first contends that the circuit court did not have jurisdiction

to determine the facts at issue and that the action should, therefore, be dismissed.

This action for declaratory judgment was commenced in the circuit court for Dane county by summons and complaint pursuant to sec. 227.05, Stats. After preliminary motions concerning the complaint were made and disposed of, the defendant answered the complaint but did not move to have any factual issues referred back to the board for determination. The defendant's answer admitted that plaintiff had urged the defendant to reconsider its position but that defendant refused to do so.

Sec. 227.05, Stats., provides in part as follows:

"(1) Except as provided in sub. (3) hereof, the exclusive means of judicial review of the validity of a rule shall be an action for declaratory judgment as to the validity of such rule brought in the circuit court for Dane county. . . . The court shall render a declaratory judgment in such action only when it appears from the complaint and the evidence presented in support thereof that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff. A declaratory judgment may be rendered whether or not the plaintiff has first requested the agency to pass upon the validity of the rule in question.

"(2) Whenever an issue of fact is raised concerning the applicability of a rule to a party or affecting the validity or proper interpretation of a rule, the court shall, before deciding the pertinent legal question, refer the case to the agency for determination of the fact issue under the declaratory ruling procedure provided in sec. 227.06."

Concededly, factual questions encompassed by the statute were at issue.

At the commencement of the trial the following colloquy took place between the court and Mr. McDermott, the assistant attorney general, representing the defendant:

*"The Court:* I take it, Mr. McDermott, that you are satisfied that the Court has jurisdiction over the subject matter?

*"Mr. McDermott:* I am. I feel this, your Honor: that this is a cause of action challenging the validity of an administrative rule. There is no doubt in my mind that this Court has jurisdiction under Sec. 227.05 of the statutes, to determine that challenge."

The case then proceeded to trial. The testimony of several witnesses, many from considerable distance, took about six days. The record is in excess of 700 pages. It was not until the testimony was closed that counsel for the defendant objected to the jurisdiction of the court.

Clearly, the circuit court for Dane county had jurisdiction over the parties and the subject matter. Sec. 227.05 (1), Stats., quoted above, provides that the exclusive means of judicial review of the validity of a rule shall be by *action* in the circuit court for Dane county, commenced by summons and complaint, and that the board be the party defendant.

The requirement of sub. (2) of sec. 227.05, Stats., that issues of fact be referred to the agency or the board, is a statutory procedural direction which does not divest the court of its substantive jurisdiction. By answering the complaint without objection to the jurisdiction of the court the defendant came within the personal jurisdiction of the court. The statute gave the court subject-matter jurisdiction of the controversy. The defendant was then obligated to object to procedural deficiencies or be deemed to have waived them. It is fundamental that procedural errors in civil matters are waived unless timely objection is made thereto. The defendant cannot sit by without objection to a procedural matter during an expensive and time-consuming trial and then voice objection. An objection timely made could prevent a procedural error.

We conclude that the defendant waived any procedural right it may have had to have issues of fact referred back to the agency.

The principal issue before us on this appeal is—Does the evidence sustain the court's finding and conclusion that the State Board of Health's threatened application of secs. H 62.01 (12), 62.03 (1), 62.06 (2), 62.06 (5) (c), and other provisions of the Wisconsin State Plumbing Code, ch. H 62, 2 Wis. Adm. Code, so as to effectually prohibit plaintiff Josam Manufacturing Company from selling its Unitron double chair carrier, wall hung, single vent, horizontal type, fitting in the state of Wisconsin interfere with and impair the legal right and privilege of the plaintiff Josam Manufacturing Company to sell a legitimate product and carry on a lawful business, all in violation of the said plaintiff's constitutional rights and in excess of the statutory authority of the defendant State Board of Health of Wisconsin?

The pertinent statute involved is as follows:

"145.01 DEFINITIONS. (1) *Plumbing.* In this chapter, 'plumbing' means and includes: . . .

"(e) A plumbing and drainage system so designed and vent piping so installed as to keep the air within the system in free circulation and movement, and to prevent with a margin of safety unequal air pressures of such force as might blow, syphon or affect trap seals, or retard the discharge from plumbing fixtures, or permit sewer air to escape into the building."

2 Wis. Adm. Code sections involved are as follows:

"H 62.01 (12) The house drainage system shall be so designed that there will be an adequate circulation of air in all pipes, no danger of siphonage, aspiration, or forcing of trap seals under conditions of ordinary use."

"H 62.03 FIXTURE UNIT DESIGN BASIS. (1) *Intermittent Flow Fixtures.* The fixture unit value and the size of traps,

vents, and piping shall be as designated in the following table for any fixture named therein. . . ." (At page 211, 2 Wis. Adm. Code, there appears a chart which provides that "Water Closet, any type" shall have a minimum vent size of two inches.)

"H 62.06 (2) *Size*. . . . Not more than two water closets shall be connected to a 3 inch soil stack. . . . Two water closets located back to back shall be connected to a 3 inch soil stack with a 3 x 3 inch double wye and one-eighth bends or similar fittings or fitting. . . ."

"H 62.06 (5) (c) *Change in direction*. . . . No common pattern double sanitary 'T', 'Y' or straight through fitting shall be used on either a vertical or horizontal stack or branch, serving wall-hung closet bowls installed back to back. . . ."

"H 62.07 (4) *Unit Vent*. . . . Where bath rooms, water closets or other fixtures are located on opposite sides of a wall or partition in the same building, or are directly adjacent to each other, such fixtures may have a common soil or waste pipe and vent pipe stack. . . ."

The "To Whom It May Concern" letter of July 3d is considered to be a rule. It was a statement of agency policy of general application. While it arose out of the "Unitron case," nothing appears to indicate that the policy expressed in the letter is limited to only Josam Unitron fittings. The testimony was that it was lodged against all single vent double chair carrier fittings.

In *Frankenthal v. Wisconsin Real Estate Brokers' Board* (1958), 3 Wis. (2d) 249, 253, 88 N. W. (2d) 352, 89 N. W. (2d) 825, we considered a comparable matter thusly:

"We have no hesitancy in holding that the issuance by the board in 1956 of the mimeographed instructions for renewal of real-estate brokers' licenses, which contained the requirement that all members of a partnership must be licensed as a condition to licensing the partnership, constituted the making of a rule reviewable by the declaratory-relief procedure set forth in sec. 227.05, Stats. The facts [sic] that no hearing

was held before adoption, if such hearing was required, and that such rule was not filed and published as prescribed by ch. 227, Stats., are wholly immaterial on the issue of whether the same was so reviewable." [1]

In deciding the issue we must first determine whether any or all of the agency rules and the statute quoted above apply. If they do apply, then the plaintiff, as to those rules which restrict it, must prove they are unconstitutional.

"Rules, regulations, and general orders enacted by administrative agencies pursuant to the powers delegated to them have the force and effect of law, . . ." 2 Am. Jur. (2d), Administrative Law, p. 119, sec. 292.

In *State v. Stehlek* (1953), 262 Wis. 642, 645, 56 N. W. (2d) 514, this court stated that it is a fundamental principle of statutory construction that a regularly enacted statute, or an order of an administrative body, made pursuant to statutory authority will be presumed constitutional. The burden of proof is beyond a reasonable doubt. In *Thomson v. Racine* (1943), 242 Wis. 591, 9 N. W. (2d) 91, it was held that commission orders are superior to municipal ordinances, where the two conflict. Commission rules, established within the jurisdiction of a commission, have the effect of public law. The court said, at page 597: " '. . . the legislative control, either directly or through its designated administrative body, is superior to any conflicting action of the legislative body of the municipality.' "

Should the rules be found applicable to plaintiff, it had the duty to prove their unconstitutionality by proof beyond a reasonable doubt. It had to show that there is no reasonable basis upon which the legislature (and hence the Board of Health) could have based its legislation (and hence the rule prohibiting single vented fitttings). See *Borden Co. v. Mc-*

[1] See also *Barry Laboratories, Inc., v. State Board of Pharmacy,* Ante, p. 505, 132 N. W. (2d) 833.

*Dowell* (1959), 8 Wis. (2d) 246, 99 N. W. (2d) 146; *Madison v. Chicago, M., St. P. & P. R. Co.* (1958), 2 Wis. (2d) 467, 87 N. W. (2d) 251.

A synopsis of the testimony is as follows:

The July 3d letter was issued to all plumbers in Wisconsin. That letter indicated that as a result of tests conducted at the Boys' Trade and Technical High School in Milwaukee, single vent systems were found to be inadequate and hence not in conformity with Wisconsin law.

At the trial, all references to the Boys' Technical School tests were excluded on motion of defendant Board of Health on the ground that the fitting used in such test was not sufficiently similar to the Josam Unitron fitting. Counsel for defendant moved to withdraw this testimony upon the advice of a sanitary engineer for the Board of Health and upon the advice of a professor of plumbing theory at Marquette University.

Defendant Board of Health also based its objections to the single vented fittings upon observations of tests conducted at the Michigan City plant of plaintiff. Mr. Koenig, one of defendant's two witnesses, and a supervisor of the division of plumbing and domestic sanitation of the Board of Health, attended that test. Mr. Koenig does not have the educational qualifications of an engineer. He has been a master plumber since 1958 and has had twenty years experience as an apprentice and journeyman plumber. He concluded that the system was inadequate, that there was crossflow, and excessive loss of water level in the water closet bowls. He claims that toilet paper placed in the water closets was carried from a downstream closet to one located upstream.[2] He also claimed

[2] It should be noted that in reference to "upstream" and "downstream" locations, that the horizontally located sewage pipe which interconnects a row of water closet fittings is installed with a built-in, predetermined amount of pitch or slope to it. This facilitates the flow of sewage in the system.

that he observed the reduction of trap seal water levels to unsafe levels. It was his opinion that the venting of the test system was inadequate to equalize the plus or minus pressures.

In rebuttal, Mr. Dwyer, chief engineer of plaintiff, offered conflicting testimony. He was not present at the test observed by Mr. Koenig. He has, however, observed other tests on similar test installations. In reference to Mr. Koenig's testimony of crossflow of toilet paper, Dwyer testified that it "could not have happened."

The results of other tests using the Unitron or other single vented back-to-back chair carrier fittings were offered in evidence.

At the Marine Plaza building, comparison tests were run between the Unitron system on the eighth floor and the double vent system on the ninth floor. Testimony was offered, also, respecting a system at the St. Croix High School and a test run at the State University of Iowa.

The experts who testified for plaintiff included master plumbers, engineers with training in pneumatics and hydraulics, and the consultant to the National Plumbing Code. One expert was the editor of the National Plumbing Code Handbook and the National Plumbing Code Illustrated.

In addition to Mr. Koenig, a Mr. Litzkow testified for defendant. He is a journeyman plumber. He has no formal training in engineering, although he has taken some night-school courses in that field. He is a state plumbing inspector.

It should be noted that the Marine Plaza and St. Croix installations were not "pure" Unitron systems. Each had an additional vent for each battery of water closets. However, there was expert testimony to the effect that the additional venting had no effect on the performance of the plumbing systems.

The Iowa experiment was testified to by Professor Lundquist. He is a professor of mechanical engineering. His

specialty is in the flow of fluids. His test installation used blowout type water closets because they require more air venting. The Iowa test installation consisted of double vent fittings with a third vent tapped into the top center of the fitting. Each of the three vent pipes on the fitting had an on/off valve. Two-inch vent pipes were used. It was argued that the Iowa test is not similar because it did not use a similar fitting. However, on cross-examination, no testimony was elicited as to how the fittings differed *in substance* from the Unitron when the Iowa fittings were used in their single vent configuration. Professor Lundquist said, respecting the sufficiency of the single vent system: "Well, we actually found that, by the use of a single vent in the middle at the center of the fitting—oh, not every fitting but every other fitting—that we got adequate performance of the toilet system. . . . Our conclusions were that the system operated as satisfactorily with the single vent in the middle as it did with the double vent."

All of the performance tests described at trial were "maximum severity" tests—simultaneous flushings of a battery of water closets. Such a test, of course, produces the greatest demands on a plumbing system. In none of the four tests was there a complete failure of the system. Results varied, with the Marine Plaza being the test installation showing the least effects of simultaneous flushing. On the other hand, the tests conducted at St. Croix showed this system to be the least satisfactory. There was a substantial drop in water levels, although trap seals were never completely pulled. Mr. Dwyer, on rebuttal, attempted to explain the results. Contrary to the method used by the Board of Health when it conducted tests at St. Croix, Dwyer connected measuring devices to register what was occurring within the pipes. He measured the water pressure at the washrooms at 85–86 pounds per square inch. He testified that this was quite high, the normal pressure being about 60 pounds per square

inch. It meant that the automatic flush valves had a shorter cycle and less water would be available to refill the water closet bowls. He installed manometers in the vent pipes to measure the system air pressure. There was no negative pressure in the lines. On/off valves were inserted in the vent pipes (although no valve was installed in the four-inch vent pipe, a point stressed by defendant). With all vent pipes closed (except the four-inch pipe), no appreciable difference in performance resulted during a simultaneous flushing of the water closets. This was explained because there was so much water in the waste line that it backed up to the water closets. Dwyer testified that larger vents would not improve the system, but that the system was adequate under conditions of normal usage, with a margin of safety. The gist of his testimony was that the performance problems under conditions of maximum severity were not attributable to the venting. The trial court asked Dwyer if the four-inch vent and each single chair fitting had a two-inch vent, what the results would be. Dwyer said that, "The level in the water closet bowls would still have dropped."

In summary, it should be noted that all plaintiff's expert witnesses testified that a two-inch single vent system on a double chair carrier fitting would operate efficiently under conditions of normal usage, with a margin of safety. Note further, that it is undisputed that in normal operations, no complaints have been registered by the owners of the Marine Plaza or the St. Croix High School.

The trial court found that the Unitron complies with the requirements of sec. 145.01 (1) (e), Stats., and sec. H 62.01 (12), 2 Wis. Adm. Code, and that the threatened application of secs. H 62.01 (12), 62.03 (1), 62.06 (2), and 62.06 (5) (c), 2 Wis. Adm. Code, imposed an unconstitutional limitation upon plaintiff's right to sell a legitimate product and carry on a lawful business.

We agree that sec. 145.01 (1) (e), Stats., and sec. H 62.01 (12), 2 Wis. Adm. Code, apply, and that Unitron does meet the requirements of performance required by this statute and rule.

The question then remains as to whether the other provisions of the Wisconsin Administrative Code, ch. H 62, apply to the Unitron. Because the facts are before this court, a question of law is presented. Of course, great weight should be given to an administrative-agency interpretation and application of its own rules—unless plainly erroneous or inconsistent with the regulations so interpreted. *State ex rel. Durando v. State Athletic Comm.* (1956), 272 Wis. 191, 75 N. W. (2d) 451. Further, the power of an agency to make rules must exist within the framework of the statute creating the agency. A rule must be in accord with the statutory policy, *State ex rel. Baranowski v. Koszewski* (1947), 251 Wis. 383, 29 N. W. (2d) 764, said policy in the present case being expressed in sec. 145.01 (1) (e), Stats.

Sec. H 62.07 (4), 2 Wis. Adm. Code, permits back-to-back installations of water closets. It further provides that such unit may have a common vent. Sec. H 62.06 (2) in respect to back-to-back installations, requires a three-inch soil stack. Thus, that section is not applicable. Sec. H 62.06 (5) (c), prohibits common pattern double sanitary "T," "Y," or straight through fittings for use on a vertical or horizontal stack for wall hung water closets. It is submitted that the Unitron is not such a fitting. There was testimony which showed that the Unitron is unlike the fittings referred to in sec. H 62.06 (5) (c) because of the nature of its internal baffling. Baffling directs the flow of waste and prevents crossflow—the claimed presence of crossflow constituting one of Mr. Koenig's objections to the Unitron. Koenig further testified that sec. H 62.06 (5) (c) refers to the double chair carrier fitting. He said: "*Q.* Well, a double

chair carrier fitting by design replaces any such thing as a wye or straight through fitting, doesn't it? *A*. It takes the place of that type of fitting, yes, sir." Mr. Manas, a professional engineer, master plumber, and editor of the National Plumbing Code Handbook and National Plumbing Code Illustrated, and a consultant in the development of the Unitron, testified that the sanitary "T," "Y," or cross is not comparable to the Unitron fitting. The Unitron has different baffling. There is no danger of crossflow. Venting has no relation to crossflow.

It would seem fair to state that sec. H 62.06, 2 Wis. Adm. Code, does not apply to the Unitron. Because the Unitron meets the requirements of sec. 145.01 (1) (e), Stats., and sec. H 62.01 (12), 2 Wis. Adm. Code, rules inconsistent with the legislative standard of performance (sec. 145.01 (1) (e)) must fall by the wayside.

Sec. H 62.03 (1) is the only section which might be applicable on its face. The defendant argues that that rule requires two two-inch vents, or that other code provisions require a single three-inch vent. The code was enacted prior to the creation of the Unitron fitting. It would seem that the code just does not contemplate a Unitron type of fitting. The entire code does not seem to reflect the use of an internally baffled "T" shaped fitting which would function with only a single vent. Note Mr. Manas' testimony, *supra,* that venting is not related to the question of crossflow, which is the function of the internal baffles to prevent.

Assuming that the administrative rules prohibit the use of the Unitron type of fitting, in light of the record such requirement is constitutionally void.

There is no question that proper sanitation is a matter of public concern. Police power extends to the field of public health. *Rust v. State Board of Dental Examiners* (1934), 216 Wis. 127, 256 N. W. 919; *Milwaukee v. Kaun* (1931),

204 Wis. 103, 235 N. W. 551; *State ex rel. Hickey v. Levitan* (1926), 190 Wis. 646, 210 N. W. 111.

Our inquiry must therefore be directed to whether or not the requirement of the Board of Health bears any reasonable relation to public health. 16 C. J. S., Constitutional Law, pp. 968, 969, sec. 198; *Caledonia v. Racine Limestone Co.* (1954), 266 Wis. 475, 63 N. W. (2d) 697; *State ex rel. Carter v. Harper* (1923), 182 Wis. 148, 196 N. W. 451; *John F. Jelke Co. v. Emery* (1927), 193 Wis. 311, 214 N. W. 369; *Mehlos v. Milwaukee* (1914), 156 Wis. 591, 146 N. W. 882; *State v. Withrow* (1938), 228 Wis. 404, 280 N. W. 364. Plaintiff must show by proof beyond a reasonable doubt that the rules do not bear any reasonable relationship to the public's interest in its public health.

An agency rule cannot stand on nonexistent footings. What are those footings in the instant case? The test referred to in the letter of July 3, 1961, was, by the board's own admission, not relevant. Thus, in the letter, when the board says that in light of tests conducted it found single vent systems inadequate, there is no basis for such statement in reference to a Unitron type fitting. Next, the board placed great reliance on the observations of its Mr. Koenig and what he saw at Josam's Michigan City tests. However, Koenig's testimony was squarely controverted by Mr. Dwyer. Further, all the experts with professional training stated that a Unitron type fitting and system would operate satisfactorily with a margin of safety under conditions of ordinary use.

Mr. Manas testified that the extra venting in the Marine Plaza installation added nothing; it merely vented the vent. He said: "You have all the air necessary to equalize your pressures within the horizontal." Mr. Dwyer testified that he feels "that the single-vent Unitron fitting will most satisfactorily allow air to circulate within a plumbing system to prevent trap-seal disturbance," when installed in an array of

eight back-to-back water closets. On cross-examination he was asked the following questions and gave the following answers: "Will the additional venting in the Marine Plaza system, as to which you testified yesterday, will it help in preventing the building up of plus or minus pressures in the plumbing system for the Marine Plaza Building at Milwaukee? *A*. No, sir. *Q*. You say flatly it will not? *A*. No, sir."

Mr. Beaudry, a consulting engineer, familiar with hydraulics and pneumatic pressures, testified as to his opinion of the Marine Plaza installation. He said, "In conclusion we can safely state that, as far as maintaining a sanitary condition and operating in a normal manner, the single vented back-to-back carrier certainly was capable of doing its job. . . . It is our personal opinion that the dual vent carrier can do no better than the single vent carrier as far as maintaining a safe sanitary condition for these fixtures."

Mr. Eaton, a private consulting engineer with thirty years experience in experimental and theoretical studies at the National Bureau of Standards, testified that the probability of simultaneous flushing of all nine water closets at the Marine Plaza is one chance in a hundred billion. In congested places, such as barracks, one would experience twice the frequency of use. He considers the Marine Plaza installation adequate. Respecting double vented fittings, he said that it would give a little more capacity, but that it would not double it. On cross-examination, he testified that the average frequency of use must be known before one can compute the probability of use. He has not made specific studies of the frequency of use in office buildings. On redirect, he testified that it was his opinion that the Marine Plaza installation without the additional venting was sufficient with a margin of safety.

It must be remembered that the standard of performance is to be judged under conditions of ordinary use and not

under these maximum severity tests. These latter tests really serve only as a guide to the overall sufficiency of the systems, *with a margin of safety,* under normal conditions.

Can it be said that the Board of Health rules bear a reasonable relationship to the requirements for sufficient standards of plumbing installations? Consider the following cases. In *Mehlos v. Milwaukee, supra,* it is said, at page 599:

"There must be reasonable ground for the police interference and also the means adopted must be reasonable for the accomplishment of the purpose in view. So in all cases where the interference affects property and goes beyond what is a reasonable interference with private rights, it offends against the general equality clauses of the constitution, . . ."

And at page 600:

"However, given a subject in respect to which there is some reasonable necessity for regulation, fair doubt in respect thereto being resolved in favor of the affirmative, in case of the legislature having so determined, the degree of exigency is a matter wholly for its cognizance."

On this state of the record, no "fair doubt" exists as to public necessity requiring its water closets to have two vent orifices and pipes where such water closets are mounted in a back-to-back relationship upon a Unitron type fitting.

In *McGraw-Edison Co. v. Sewerage Comm.* (1960), 11 Wis. (2d) 46, 52, 104 N. W. (2d) 161, it is said:

"Obviously, the enforcement of a rule which bans plaintiffs' product in the large and growing Milwaukee metropolitan area would impair the operation and expansion of their business in the future. Prohibition of the use of a suitable and legitimate product certainly interferes with plaintiffs' right to carry on a lawful business."

At page 51 the court said:

"But where existing conditions render cast-iron pipe no more, or even less, efficacious in that respect than other pipe

materials, it is manifestly arbitrary and unreasonable to require it."

This court will follow the findings of the trial court on the disputed questions of fact unless the evidence has been wrongly received, or unless against the preponderance of the evidence. *Will of Heymann* (1926), 190 Wis. 97, 208 N. W. 913. There has been no error, the evidence far exceeds that for proof beyond a reasonable doubt. The trial court in its memorandum opinion said, "Plaintiff has established its position with solid affirmative proof that convinces us beyond a reasonable doubt of the merit of its position."

The regulations of the Plumbing Code referred to specifically herein and relied upon by the defendant are not prohibitive of the use and installation of the plaintiff's double chair carrier Unitron fittings and similar fittings in the state of Wisconsin, and the several pronouncements, bulletins, and interpretations of the employees and agents of the defendant are construed to be invalid, void, and of no legal effect as to the plaintiff's said plumbing fittings.

*By the Court.*—Judgment affirmed.

WILKIE, J., took no part.