LIBERTY HOMES, INC., Moduline International, Inc., and Commodore Home Systems, Inc., Plaintiffs-Appellants,

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Defendant-Respondent.†

Court of Appeals

*No. 82–2427. Submitted on briefs April 16, 1984.— Decided July 18, 1985.*
(Also reported in 374 N.W.2d 142.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the plaintiffs-appellants the cause was submitted on the briefs of *Edward F. Canfield, John R. Gerstein* and *Casey, Scott & Canfield, P.C.* of Washington, D.C., and *Norman C. Anderson, Stuart G. Mondschein* and *Wheeler, Van Sickle, Anderson, Norman & Harvey, S.C.* of Madison.

For the defendant-respondent the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *Bruce A. Olsen,* assistant attorney general.

Before Gartzke, P.J., Dykman, J., and Rudolph T. Randa, Reserve Judge.

GARTZKE, P.J.   Liberty Homes, Inc., Moduline International, Inc., and Commodore Home Systems, Inc., brought this action against the Department of Industry, Labor and Human Relations, for a judgment declaring that Wis. Adm. Code sec. Ind 14.03 is invalid.[1] This rule establishes a .4 parts per million maximum permissible formaldehyde concentration in the ambient indoor air of new mobile homes offered for retail sale in Wisconsin.[2] The trial court dismissed the complaint.

---

[1] Manufactured Housing Institute, Inc., joined the appeal but withdrew.

[2] Wis. Adm. Code ch. Ind 14 was renumbered as ch. ILHR 27 by Wis. Adm. Reg. No. 351 (March 1985). The renumbering created no substantive change in the text of the rule. We refer to the rule as Ind 14.03 throughout this opinion, except to use the new designation for purposes of this footnote. The rule provides as follows:

ILHR 27.03 Indoor ambient air quality standards. (1) CHEMICAL LEVELS. All new mobile homes designed and constructed on or after the effective date of this rule and offered for retail

The issues are whether the rule is within the scope of DILHR's rulemaking authority, whether the record sup-

sale in Wisconsin shall not exceed the chemical concentration in ambient indoor air established in Table ILHR 27.03 as of 60 days after the date of manufacture.

TABLE ILHR 27.03

| Chemical | Ambient Indoor Air Maximum Concentration |
| --- | --- |
| Formaldehyde | .40 ppm time weighted average (TWA) for duration of test |

. . . .

(2) INDOOR TESTS. Tests performed to determine the presence and concentration of formaldehyde (HCHO), shall be performed within the mobile home. This section does not require mandatory in-plant testing of mobile homes at the manufacturing plant or dealer's lot.

(3) TEST METHODS. All tests performed by the department to determine the presence and concentration of formaldehyde shall be conducted in accordance with the National Institute of Occupational Safety and Health Manual of Analytical Methods, Second Edition, Volume 1, NIOSH 77–157–A, 1977, method number P & CAM 125, Formaldehyde in Air, except as amended by NIOSH Manual of Analytical Methods, Vol. 7 DHSS (NIOSH) Publication No. 82–100, August, 1981, Page xi, or other test methods established by departmental rule.

(4) SPECIAL TEST CONDITIONS AND PROCEDURES. In addition to the test methods specified in sub. (3), the department shall comply with the following conditions and procedures.

(a) *Temperature and relative humidity.* Testing shall be carried out at an indoor temperature within the range from 70° F. to 85° F. and at ambient relative humidity conditions. The resulting formaldehyde test levels shall be corrected to a 78° F. condition . . . .

(b) *Ventilation.* The mobile home shall be aired out with all interior doors, cabinets, closets and drawers open for maximum air exchange, for 2 hours prior to the close-up period. The windows and exterior doors of the mobile home shall be closed for 2 hours prior to commencement of the test with all gas appliances turned off and no smoking permitted while the home is closed prior to testing and during the test.

ports the factual basis for Wis. Adm. Code sec. Ind 14.03, whether it is possible to comply with an ambient air

1. EXCEPTION. Mobile homes equipped to provide tempered outside air may be tested with the ventilation system operating at a maximum rate of 1 air change per hour.

(c) *Furniture and contents.* Tests shall be conducted with carpeting, furniture, draperies and other furnishings in place.

(d) *Location of samples.* Except as specified in subd. 2., each sample shall be taken in the center of the habitable room, at a point which is approximately equidistant from opposing walls and at a height of 3½ to 4 feet above the floor. Samples shall be taken in the habitable portion of each of the following habitable rooms:

1. Bedroom.

2. Kitchen, on or in vicinity of kitchen cabinets.

3. Living room.

(e) *Length of sampling.* The test sampling for both indoor and outdoor ambient air shall be performed at least one hour, unless otherwise approved by the department.

(5) TEST RESULTS AND TEST REPORT. (a) Validity. No tests shall be considered valid for the determination of formaldehyde concentration in the air unless made after a minimum of 60 days from the date of the manufacture of the mobile home tested.

(b) *Test results.* The ambient indoor formaldehyde concentration of a mobile home shall be the arithmetic average of the 3 samples specified in sub. (4)(d).

. . . .

(6) RANDOM TESTING. The department may conduct random testing of mobile homes to determine compliance with the indoor air quality standard specified in this section.

(7) COMPLAINT TESTING. (a) *Complaint test.* Upon complaint notification from an owner of a mobile home, the department or its authorized representative shall test the mobile home to determine compliance with the indoor air quality standards specified in Table ILHR 27.03. The department will not respond to complaints filed for mobile homes which are more than 24 months old, including mobile homes where the manufacturer has extended the warranty beyond the 24 month period.

. . .

(10) PRODUCT SAFETY INFORMATION. (a) *Pre-sale warning.* Prior to retail sale, the purchaser shall be notified in writing that building materials and other products in mobile homes may emit formaldehyde which may result in unpleasant

standard, whether the rule violates the commerce clause, U.S. Const. art. I, sec. 8, cl. 3, and whether the rule is preempted by a federal regulation adopted after the Wisconsin regulation. We hold that adoption of the rule is within DILHR's authority, that the record supports sec. Ind 14.03, that it does not burden interstate commerce, and that federal regulation preempts the rule from and after the effective date of the federal regulation, February 11, 1985. We therefore hold that mobile homes "designed and constructed" between October 1, 1981 and February 11, 1985 only are subject to sec. Ind 14.03, and we modify the judgment accordingly.

## I.

## HISTORY OF THE CASE

A. *State Regulation*

In response to consumer complaints, DILHR prepared a draft standard on the level of formaldehyde molecules

---

odors and adverse physical effects including eye, nose and throat irritation in humans. The wording of the warning shall be approved by the department. The warning shall indicate that formaldehyde concentrations are regulated by the Wisconsin department of industry, labor and human relations.

(b) *Mobile home label.* All mobile homes offered for retail sale in this state on or after the effective date of this rule shall have affixed to the front door or pre-sale warning label which shall be obtained from the department and which shall read as follows:

### WARNING

Formaldehyde concentrations in this mobile home are regulated by the Wisconsin Department of Industry, Labor and Human Relations. Product safety information, approved by the department about the effects of formaldehyde and the department's regulation of formaldehyde shall be provided to the purchaser prior to the sale of this home. This label shall not be removed by the mobile home manufacturer or any person offering this mobile home for retail sale in Wisconsin.

in the indoor air of mobile homes. DILHR held public hearings on the matter in February 1980.[3] It submitted a proposed draft to a legislative standing committee, and following hearings before two such committees in November 1980, it published the standard as a rule in the March 1980 administrative review, to take effect October 1, 1981. In September 1981 appellants brought this action to challenge the rule. The trial court "enjoined [DILHR] from enforcing Ind 14.03." DILHR then proposed to amend the rule, and after another public hearing, DILHR submitted a revision to the legislature for comment. DILHR adopted the rule amendments April 2, 1982, effective May 1, 1982. Appellants continued their challenge. The trial court took testimony and rendered a written opinion, followed by factual findings and conclusions.

The trial court said it based its review on *Westring v. James,* 71 Wis. 2d 462, 238 N.W.2d 695 (1976), *Josam Mfg. Co. v. State Board of Health,* 26 Wis. 2d 587, 133 N.W.2d 301 (1965), and *Wis. Tel. Assn. v. Public Service Comm.,* 105 Wis. 2d 601, 314 N.W.2d 873 (Ct. App. 1981). After concluding that DILHR may adopt the rule, the court said that whether DILHR could find .4 parts per million of formaldehyde is enough to cause a health problem is to be reviewed as a quasi-legislative

---

[3] At least two other state agencies have attempted to regulate formaldehyde in connection with home construction. A Massachusetts agency banned the sale, distribution and uses of urea-formaldehyde insulation and required its removal. The Massachusetts Supreme Court upheld the rule. *Borden, Inc. v. Commissioner of Public Health,* 448 N.E.2d 367, 382 (Mass. 1983). A Minnesota agency established a rule setting a .55 parts per million maximum indoor air level of formaldehyde in newly-constructed housing units. The Minnesota Supreme Court held that the selection of that standard was arbitrary because it was not explained and remanded the matter for return to the agency for reconsideration. *Manufactured Housing Institute v. Pettersen,* 347 N.W.2d 238 (Minn. 1984).

decision and that DILHR's medical evidence supports a lower standard. The court said that because the .4 ppm standard exceeds a level which the facts could support, it is not unreasonable. Because manufacturers can produce materials which meet the standard, the court rejected an argument that it cannot be met. It rejected an attack on the specified test for formaldehyde. It concluded that the facts were such that they may be reasonably conceived to sustain the regulation and dismissed the complaint.

B. *Federal Regulation*

After the briefs were filed, DILHR brought to our attention regulations, 49 Fed. Reg. 31996 et seq. (1984) (to be codified at 24 CFR pt. 3280) adopted by the U.S. Department of Housing and Urban Development, pursuant to the Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. Secs. 5401 et seq. 1983, effective February 11, 1985. The new HUD regulations deal with formaldehyde in the indoor ambient air of "manufactured homes." The federal definition of a "manufactured home" includes a "mobile home" under Wisconsin law.[4] HUD's standards not having been adopted when the trial court rendered its judgment declaring Wis. Adm. Code sec. Ind 14.03 valid, we requested additional briefs on the preemption issue.

The federal act authorizes HUD's secretary to establish manufactured home construction and safety standards. In June 1979 HUD began a rulemaking procedure to that end. In August 1981 HUD published notice of

[4] The parties treat the federal definition of manufactured home as encompassing a mobile home subject to Wis. Adm. Code ch. Ind 14. 42 U.S.C. sec. 5402(6) defines manufactured home. Section 101.91(1), Stats. 1981–82, defined mobile home when sec. Ind 14.03 first took effect October 1, 1981. We note that sec. 101.91(1) was amended by sec. 1375o 1983 Act 27 effective July 2, 1983 to limit the definition of mobile home to "vehicle[s] manufactured or assembled before June 15, 1976."

proposed rulemaking, directed solely to the issue of formaldehyde emissions in manufactured homes. The history of that proceeding, the standards finally adopted and the reasons for it are set forth in 49 Fed. Reg. 31996 et seq. (1984). The pertinent federal standard is 24 CFR sec. 3280.308(a), effective February 11, 1985, which provides:

Formaldehyde emission levels. All plywood and particleboard materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes;
(1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm) as measured by the air chamber test method specified in § 3280.406.
(2) Particleboard materials shall not emit formaldehyde in excess of 0.3 ppm as measured by the air chamber test specified in sec. 3280.406.

When adopting its standards, HUD stated, "It is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act (42 U.S.C. sec. 5403(d))." 49 Fed. Reg. at 31997 col. 2.

## II.

## STATUTORY AUTHORITY

Appellants argue that DILHR lacks statutory authority to adopt Wis. Adm. Code sec. Ind 14.03 because it is not a "design and construction" standard. We disagree.

Sections 101.92(1) and 101.94(2), Stats. 1981–82, authorized DILHR to adopt rules for the "safe and sanitary design and construction of mobile homes." Wis. Adm. Code sec. Ind 14.03(1) is a design and construction standard. It effectively requires manufacturers to use low formaldehyde-emitting materials when designing and

constructing mobile homes offered for sale in Wisconsin. We conclude that DILHR did not exceed its statutory authority.

## III.

## FACTUAL BASIS FOR RULE

A. *Scope of Review*

We must first establish how we will review the sufficiency of the factual basis for an administrative rule. *Westring v. James, supra,* did not involve the validity of an administrative rule. In *Wis. Tel. Ass'n v. Public Service Comm.,* 105 Wis. 2d at 611, 314 N.W.2d at 877–78, we said that if we could reasonably conceive that facts exist to justify an administrative rule, we would presume their existence. We relied on *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 185 (1935). We also cited *Josam Mfg. Co. v. State Board of Health,* 26 Wis. 2d at 603, 133 N.W.2d at 310, to the effect that a rule's challenger must show by proof beyond a reasonable doubt that the rule does not bear a reasonable relationship to its purpose.

Appellants urge us to abandon our precedent. They ask for a "hard look" to see if the underpinnings for the rule are supported by substantial evidence. They note that Professor Davis has said, "The law has clearly moved away from the 1935 answer, in *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 186 (1935), that a court will presume the existence of facts justifying rules." 1 K. Davis, *Administrative Law* sec. 6 : 16 at 508 (2d ed. 1978). Professor Davis continues in his analysis of the federal law :

The present law is quite different . . . . The judicial movement toward requiring factual support in rulemaking records is so strong that today's lawyers and judges usually seem to take the requirement for granted, even

though the Supreme Court has taken no position on the question since the surge of rulemaking during the 1970s.

*Id.* at 524. Appellants cite federal cases which have indeed moved away from the 1935 answer; *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971) (reviewing court should engage in a substantial inquiry) ; *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 402 (D.C. Cir. 1973), *cert. denied,* 417 U.S. 921 (1974) (court must determine whether the agency has exercised reasoned discretion) ; *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C. Cir.) (en banc), *cert. denied,* 426 U.S. 941 (1976) (courts must not rubberstamp agency action).

DILHR argues that regardless of the scope of review the trial court said it applied, the court actually determined that the purported facts on which the rule rests have a substantial basis in the record. Thus, DILHR acquiesces in appellants' position that the substantial evidence test should be applied.

The express or implied agreement of the parties on questions of law does not, of course, bind us. *Swift & Co. v. Hocking Valley R. Co.,* 243 U.S. 281, 289 (1917). This is particularly true when the question is a difficult one involving the scope of judicial review. We encourage the parties to an appeal to acknowledge the correctness of each other's views. For us to abide by their agreement in this appeal, however, could affect future judicial review of administrative rules. We will not accept the agreed scope of review without examination.

Fixing the limits of review involves the application of ch. 227, Stats., entitled "Administrative Procedure and Review," which has been in effect since 1943. Chapter 227 represents an attempt "to codify . . . , and make applicable to virtually all state-wide administrative activities, the procedure to be followed by administrative agencies with reference to their rules and regulations

and their conduct of contested cases, and to the method of judicially reviewing their determinations." Hoyt, *The Wisconsin Administrative Procedure Act,* 44 Wis. L. Rev. 214 (1944).

Considering that ch. 227, Stats., attempts a codification, the absence of a statutory standard to test the factual basis for an administrative rule is remarkable. An action for declaratory judgment is the exclusive means of judicial review of the validity of a rule. Sec. 227.05 (1). The court must declare a rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rule-making procedures. Sec. 227.05 (4) (a). Nothing, however, in ch. 227 tells a court called upon for a declaratory judgment how to determine the sufficiency of a rule's factual basis.[5]

The absence of a statutory test to weigh the factual basis of an administrative rule is all the more striking when we consider the statutory standard which courts must apply on review of an agency's decision in a contested case. If the agency's action depends on any fact found by the agency in a contested case proceeding, the reviewing court must "set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." Sec. 227.20 (6), Stats.

---

[5] Section 227.05 (1) provides that the court shall render a declaratory judgment "only when it appears from the complaint and the supporting evidence" that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff. "Supporting evidence" is not defined by statute or case law. It appears to refer to the evidence produced in the declaratory judgment action but does not state under what circumstances additional testimony should be taken on the factual basis for the rule.

We note also that a marked contrast exists between rulemaking and contested case hearings before the agency. Section 227.022, Stats., controls the conduct of a rulemaking hearing. In a rulemaking hearing, the agency need only afford interested persons an opportunity "to present facts, views or arguments" and "to present facts, views or arguments in writing whether or not [the interested person] has had an opportunity to present them orally." Sec. 227.022(1). No reference is made in sec. 227.022 to the rules of evidence or even to evidence or testimony in rulemaking. The agency need only "keep minutes or a record of the hearing in such manner as it determines to be desirable and feasible." Sec. 227.022 (3).

A contested case is far more formal than a rulemaking proceeding. The parties must have an opportunity "to present evidence and to rebut or offer countervailing evidence." Sec. 227.07(3), Stats. The agency or examiner presiding at a contested case is not bound by the rules of evidence but must "admit all testimony having reasonable probative value," must apply the rules of privilege and must apply basic principles of relevancy, materiality and probative force. Sec. 227.08(1). Provisions exist for taking official notice of facts, receiving documentary evidence, cross-examination, and the taking and preservation of evidence as provided in ch. 804, Stats. Sec. 227.08(3)–(7). The contents of the record are specified and must include the "[e]vidence received or considered, stipulations and admissions," and "[q]uestions and offers of proof, objections and rulings thereon." Sec. 227.07(6)(b) and (d).

We infer from the contrasts between rulemaking and contested case hearings and from the absence of a standard to test the factual basis of a rule in a declaratory action, that the legislature did not intend the substantial evidence test to apply to judicial review of administrative

rules. We draw that inference because it makes little sense to apply the substantial evidence rule to a proceeding which is not designed to produce the type of record which a contested case should develop.

Appellants urge us to adopt a sliding scale to scrutinize the facts, giving deference to facts which are akin to agency policy decisions, and allowing for sharper scrutiny of more objective facts.[6] The attorney general, speaking for DILHR, finds the sliding scale suggestion unobjectionable.

We are unable to infer from ch. 227, Stats., a legislative intent to authorize a sliding scale test for the factual basis of a rule. A sliding scale would make the intensity of review depend on the nature of the fact, but nothing in ch. 227 makes the degree of proof in rulemaking dependent on the type of fact.

We conclude that we should continue to follow the rule we announced in *Wis. Tel. Ass'n. v. Public Service Comm., supra.* If we can reasonably conceive that facts exist to justify the rule chosen by an administrative agency, we will presume their existence, leaving to the rule's opponents to show that the facts do not exist or are insufficient basis for the rule. If, of course, the record contains evidence that supports the rule, then that provides a sufficient basis for the rule, whether or not the evidence would survive a "hard look."

B. *Factual Basis Exists*

1. *Formaldehyde Level*

Appellants assert that although DILHR adopted Wis. Adm. Code sec. Ind 14.03 to assure the safe and sanitary

---

[6] Appellants suggest that the legislature intended just this, citing the dissent in *Aetna Life Ins. Co. v. Mitchell*, 101 Wis. 2d 90, 124-25, 303 N.W.2d 639, 655 (1981) (Abrahamson, J., dissenting). The court of appeals can hardly rely on a dissent to a supreme court opinion as stating the law of this state.

design and construction of mobile homes, no basis exists for DILHR's finding that a formaldehyde level above .4 parts per million in mobile homes presents a safety problem. They urge that no adverse health effects exist at .4 parts per million of formaldehyde. Appellants conclude that no factual basis exists for a .4 ppm standard adopted to assure the safe and sanitary design and construction of mobile homes. DILHR, however, found a need for a .4 ppm standard on a showing that formaldehyde is an irritant in mobile homes.

The record indicates that irritation can occur at even lower levels. DILHR had, for example, a 1980 report prepared by the National Academy of Sciences. According to that report, some human eyes are irritated at levels as low as .01 ppm, and the central nervous and olfactory systems are sensitive to concentrations as low as .05 ppm.

Appellants assert that DILHR had no epidemiologist, medical personnel, pathologist, biochemist or biostatisticians working on the development of the standard or analyzing its basis for it. DILHR nevertheless had evidence before it supporting the .4 parts per million standard. This exceeds the standard of *Wis. Tel. Assn. v. Public Service Comm., supra.* We will not apply a stricter standard.

2. *NIOSH TEST*

Appellants contend it is impossible to comply with the .4 parts per million standard using the test DILHR prescribes to measure formaldehyde concentrations. The rule prescribes the NIOSH P & Cam 125 test. Wis. Adm. Code sec. Ind 14.03(3). Appellants assert that they have demonstrated conclusively that the test is unsuitable for regulatory purposes.

DILHR could conclude that the NIOSH test is reasonably accurate. The Formaldehyde Institute is a national association of industries using formaldehyde. Its membership includes mobile home manufacturers. The Insti-

tute reported to the United States Department of Housing and Urban Development that the NIOSH test has a proven record and established laboratory accuracy. A large manufacturer of material used in mobile homes stated that the NIOSH method is well understood, reliable and accurate for measuring levels lower than .4 parts per million.

Appellants rely heavily on a failure report issued by NIOSH itself. The report states that experiments with samples taken pursuant to the NIOSH method showed poor stability if stored over a five-day period at room temperature, furnishing values as much as 86% lower than 1-day-old samples. Lower values, however, would seem to work in favor of a mobile home manufacturer. Further, the record shows that complaint testing will be performed for DILHR by the State Laboratory of Hygiene, which can process samples within one day and has refrigerated transportation available.

Appellants refer to the circuit court testimony of their witnesses that the NIOSH test has unacceptable error rates, is unreliable and should not be used. The record, however, supports DILHR's contrary decision. We will not disturb that decision.

We conclude that the record supports Wis. Adm. Code sec. Ind 14.03.

IV.

COMPLIANCE THROUGH USE OF AMBIENT AIR TEST

Appellants assert that a mobile home manufacturer cannot reasonably assure himself of compliance with the rule by using the ambient air test. Appellants rely on the undisputed fact that a mobile home may contain various

sources of formaldehyde, some of which are caused by its occupants and its contents, and that it is not possible to determine the relative contributions of each source to the ambient air concentration of formaldehyde. We conclude that DILHR could conclude that its test procedure meets appellant's objection.

It is undisputed that particle board and plywood are the major contributors to formaldehyde in the ambient air of a mobile home.[7] DILHR had information that the

---

[7] The department stated in its 1980 report:

Based upon the best information collected throughout this proceeding, the building components [of a mobile home] and percentage of formaldehyde emitted are as follows:

| Building Component | Percent of Formaldehyde Emitted |
|---|---|
| Carpeting | 5% |
| Paneling | 20% |
| Particle Board | 44% |
| Glue & Adhesives | 14% |
| Draperies | 4% |
| Ceiling Tile | 6% |
| Other Sources | 7% |
| | 100% |

Equilibrium tests* performed on a variety of wood products, textiles and carpets [in a mobile home] showed the following:

| Material | Temperature | Before Airing HCHO (ppm) | After 24 Hour Airing Cycle HCHO (ppm) |
|---|---|---|---|
| Carpeting | 85° | .05 | None |
| Plywood Paneling | 85° | .20 | .60 |
| Particle Board | 85° | .44 | 1.20 |
| Drapes & Curtains | 85° | .04 | None |
| Ceiling Tile | 85° | .06 | None |

* Equilibrium Levels of Formaldehyde Due to Emissions from Various Materials (Seymour 1979)

few "positive inferences" resulting in higher readings were in the area of .01 percent to one percent, but the more numerous negative inferences were far greater. Tests by the department tend to show that formaldehyde levels from carpeting, draperies and ceiling tiles are lower initially, emit rapidly, and are insignificant after airing.[8] The rule, as adopted, requires a two-hour airing period. Wis. Adm. Code sec. Ind 14.03 (4) (b).

## V.

## COMMERCE CLAUSE

Appellants argue that Wis. Adm. Code sec. Ind. 14.03 impermissibly burdens interstate commerce. They contend that it will require manufacturers to redesign and manufacture all of the homes or to specially manufacture Wisconsin homes at unreasonable costs. We reject the argument.

The distinction between permissible and impermissible impact on interstate commerce "involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the burden imposed on the course of interstate commerce." *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 441 (1978). The general rule is that

---

These test results show that formaldehyde levels from carpeting, draperies and ceiling tiles are lower initially, emit rapidly and are insignificant after airing.

In other testing, neither fiberglass nor mineral wood insulations emitted any noticeable amount of formaldehyde despite the fact that they contain formaldehyde (Berger Sundin).

These tests lead the department to believe that particleboard and plywood paneling are the major building products contributing to increased levels of formaldehyde in mobile homes.

(Footnotes omitted.)

[8] See footnote 6.

[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is already excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church*, 397 U.S. 137, 142 (1970) (citation omitted).

Wisconsin Adm. Code sec. Ind 14.03 regulates the sale of mobile homes in Wisconsin regardless of point of manufacture. The health and safety of the inhabitants of these homes are a legitimate local interest. Appellants presented no evidence that the cost of mobile homes sold elsewhere will rise because of the Wisconsin regulation. We conclude that appellants have not shown that sec. Ind 14.03 impermissibly burdens interstate commerce.

## VI.

## PREEMPTION

A. *Preemption Doctrine*

The confluence of the state and federal formaldehyde standards raises the issue whether the federal regulation preempts Wisconsin's regulation. This is especially true since HUD published its express intent to preempt state efforts to regulate formaldehyde emissions in mobile homes.

The preemption doctrine nullifies certain state laws and regulations on constitutional grounds. The supremacy clause in U.S. Const. art. VI invalidates state laws which "interfere with, or are contrary to the laws of

Congress." *Gibbons v. Ogden,* 22 U.S. 1, 211 (1824). Whether state action is preempted by federal law turns on the intent of Congress. *Allis-Chalmers Corp. v. Lueck,* 471 U.S. —— , —— (1985), 85 L. Ed. 2d 206, 213. Federal law may preempt state law in three ways: when congress explicitly defines the extent to which it intends to preempt state law; when congress indicates an intent to occupy an entire field of regulation; and when state law conflicts with federal law and compliance with both laws is impossible. *Michigan Canners Etc. v. Agricultural Bd.,* —— U.S. ——, —— (1984), 81 L. Ed. 2d 399, 406.

Federal regulations, like federal law, may preempt state action.

Federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. When the administrator promulgates regulations intended to preempt state law, the court's inquiry is similarly limited: "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*Fidelity Federal S. & L. Assn. v. de la Cuesta,* 458 U.S. 141, 153–54 (1982) (quoting *United States v. Shimer,* 367 U.S. 374, 383 [1961]).

The preemption doctrine is tempered with cautionary rules. Preemption analysis assumes "that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). If a reviewing court is left with doubt as to congressional purpose,

it should be slow to find preemption, for "the state is powerless to remove the ill effects of [the court's decision] while the national government, which has the ultimate power, remains free to remove the burden." *Penn Dairies v. Milk Control Com.*, 318 U.S. 261, 275 (1943).

We note that during its rulemaking proceedings, DILHR knew HUD was investigating formaldehyde problems in mobile homes and knew a preemption issue could arise. DILHR's *Report and Standard* released in October 1980 noted that HUD had the formaldehyde problem under study. DILHR's *Report and Standard* released in March 1982 stated:

Since no standard has been adopted by HUD, the department is free to promulgate indoor ambient air standards for formaldehyde in mobile homes.

. . . .
Under both state and federal law, the department may promulgate and enforce air quality standards related to formaldehyde in mobile homes.

B. *Federal Statutes Involved*

We turn to the pertinent federal statutes. 42 USC sec. 5401 provides:

The Congress declares that the purposes of this chapter are to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes. Therefore, the Congress determines that it is necessary to establish Federal construction and safety standards for manufactured homes and to authorize manufactured home safety research and development.

Title 42 USC sec. 5402 (7) provides:

"Federal manufactured home construction and safety standard" means a reasonable standard for the construction, design, and performance of a manufactured

home which meets the needs of the public including the need for quality, durability, and safety;

Title 42 USC sec. 5403 provides in relevant part:

[a] The Secretary, after consultation with the Consumer Product Safety Commission, shall establish by order appropriate Federal manufactured home construction and safety standards. Each such Federal manufactured home standard shall be reasonable and shall meet the highest standards of protection, taking into account existing State and local laws relating to manufactured home safety and construction.

. . . .

[d] Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

. . . .

[f] In establishing standards under this section, the Secretary shall—

(1) consider relevant available manufactured home construction and safety data, including the results of the research, development, testing, and evaluation activities conducted pursuant to this title, and those activities conducted by private organizations and other governmental agencies to determine how to best protect the public;

(2) consult with such State or interstate agencies (including legislative committees) as he deems appropriate;

(3) consider whether any such proposed standard is reasonable for the particular type of manufactured home or for the geographic region for which it is prescribed;

(4) consider the probable effect of such standard on the cost of the manufactured home to the public; and

(5) consider the extent to which any such standard will contribute to carrying out the purposes of this chapter.

Title 42 USC sec. 5422 (a) provides:

Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect to which no Federal manufactured home construction and safety standard has been established pursuant to the provisions of section 5403 of this title.

C. *Application of Preemption Doctrine*

42 U.S.C. sec. 5403 (d) explicitly defines the extent to which congress intends to preempt state law. It prohibits a state standard "applicable to the same aspect of performance . . . which is not identical to the federal manufactured home construction and safety standard." The first of the three ways described in *Michigan Canners, supra,* in which preemption can occur therefore exists.

The Wisconsin and federal standards regulate formaldehyde in mobile or manufactured homes but are not identical. Consequently, the question is whether the Wisconsin and federal standards are "applicable to the same aspect of performance" of mobile or manufactured homes. Only then does 42 U.S.C. sec. 5403 (d) prohibit a state standard which is not identical to the federal standard.

DILHR proposes a narrow reading of the phrase "same aspect of performance."[9] It does so by emphasizing the facial differences between the Wisconsin and federal standards. DILHR points out that the Wisconsin standard regulates the concentration of formaldehyde inside a mobile home. It does not prescribe the types or

---

[9] We have found two cases interpreting the phrase "same aspect of performance" in other federal statutes. *Chrysler Corporation v. Tofany,* 419 F.2d 499 (2d Cir. 1969); *Chrysler Corporation v. Rhodes,* 416 F.2d 319 (1st Cir. 1969). The *Tofany* court split on the question whether that phrase should be interpreted narrowly or broadly for purposes of determining the preemptive effect of regulations.

chemical properties of products used to construct the home. The Wisconsin test is performed under the actual ventilation conditions which occur in a mobile home. The federal standards regulate the emission rates of plywood and particle board materials, as measured by test chambers under conditions specified in 24 CFR sec. 3280.406. Plywood and particle board are measured separately and before they are incorporated into the home structure. The federal standard does not regulate the ambient air concentration of formaldehyde in completed mobile homes. 49 Fed. Reg. at 31997, col. 2. Nor does the federal standard attempt to regulate all manufactured products which contribute to formaldehyde emissions, such as medium density fiberboard or manufacturer installed furniture, carpeting and drapes.

We have no doubt that a narrow reading of the "same aspects of performance" test is inconsistent with the intent of Congress regarding the scope of HUD's standards. That intent controls the extent of preemption. *Allis Chalmers v. Lueck, supra.* Congress requires HUD to adopt manufactured home standards which "shall be reasonable and shall meet the highest standards of protection, taking into account existing state and local laws relating to manufactured home safety and construction." 42 U.S.C. Sec. 5403(a). If HUD adopts standards of protection meeting those requirements, no room is left for a state standard addressing the same problem.

The narrow reading proposed by DILHR also fails adequately to recognize that HUD's announced goal is the same as Wisconsin's: an indoor ambient formaldehyde level not exceeding .4 parts per million. HUD refers to that level as its "targeted level." 49 Fed. Reg. at 31999. HUD believes "that an indoor ambient formaldehyde level of 0.4 ppm provides reasonable protection to manufactured home occupants." *Id.* at 31998. The state would attain that goal by directly prohibiting a higher concentration in the ambient air. HUD believes that its

product standards "will result in a 0.4 ppm indoor level under the specified conditions and that this level, given economic considerations, is reasonable." *Id.* at 31999, col. 2.

To achieve its "targeted level," HUD adopted product standards after taking into account the pros and cons of both product and ambient standards and the views of many commenters, especially state agencies. HUD found that product test values reasonably correlate to formaldehyde levels in homes, products can be tested easily under standardized conditions which avoid problems connected with ambient standards, and violations of a product standard can be discovered before material is installed in a home. 49 Fed. Reg. 31997. HUD states, "[t]herefore, based on its effectiveness, the availability of reliable test methods, and the potential to prevent formaldehyde prolems before the homes are sold, the Department has concluded that a product standard is appropriate." *Id.* at col. 2.

We conclude that HUD and Wisconsin have adopted standards regarding construction or safety applicable to "the same aspect of performance" of manufactured homes, within the meaning of 42 U.S.C. sec. 5403(d). Because the state and the federal standards are not identical, 42 U.S.C. sec. 5403(d) nullifies the state standard unless, as DILHR argues, HUD has no authority to adopt its formaldehyde regulations.

DILHR's argument hinges on 42 USC sec. 5403(a), which requires that federal manufactured home standards "meet the highest standards of protection, taking into account existing State and local laws relating to manufactured home safety and construction." DILHR argues that the federal standard does not "meet the highest standards of protection." DILHR describes the Wisconsin standard as one which protects consumers by directly prohibiting formaldehyde concentrations as

actually measured inside the home. DILHR character-
izes the HUD standard as an attempt to protect con-
sumers from the same harmful exposure by regulating
the emissions of some but not all formaldehyde-emitting
building products.

The requirement in 42 U.S.C. sec. 5403(a) is two-fold:
that each manufactured home standard "shall be rea-
sonable and shall meet the highest standards of pro-
tection . . . ." This dual requirement must be read
with 42 U.S.C. sec. 5403(f), which directs HUD to con-
sider, among other things, the probable effect of the
standard on the cost of the manufactured home to the
public. HUD concluded that its product standards will
result in a .4 ppm indoor level—the same as state stan-
dards—and that HUD's level, "given economic consid-
erations, is reasonable." 49 Fed. Reg. at 31999, col. 2.
HUD's conclusion as to the reasonableness is uncon-
tested. We conclude that DILHR has failed to show
that HUD's standards were adopted without congress-
ional authority.

DILHR argues that even if the Wisconsin standard
is preempted as to new mobile homes, it still applies to
used mobile homes offered for sale within two years
of manufacture. DILHR points out that 42 U.S.C. sec.
5409(b)(1) provides that the broad prohibition against
a sale of a manufactured home which does not meet the
federal standard is inapplicable to the "sale . . . of any
manufactured home after the first purchase of it in
good faith for purposes other than resale." DILHR
construes its standard providing for continuing jurisdic-
tion over mobile homes two years after manufacture to
apply regardless whether the owner complaining about
excess concentrations is the original or any other owner.
Wis. Adm. Code sec. Ind 14.03(7)(a). Mobile homes in
Wisconsin must therefore meet the .4 parts per million
standard for two years after manufacture. Consequent-
ly, DILHR argues that Wisconsin ambient standard

continues to apply to used (in the sense of resold) mobile homes which are less than two years old because no federal standard purports to apply to formaldehyde concentrations in homes after the first purchase.

We reject the argument. To require a used or resold mobile home to comply with the Wisconsin standard would be to require compliance with the Wisconsin standard when the home is manufactured.

D. *Warning Label*

DILHR argues that the formaldehyde warning required by Wis. Admin. Code sec. Ind 14.03 (10) (b) is not preempted by the warning HUD requires. The HUD warning is quoted in the footnote.[10] The federal warn-

---

[10] 24 C.F.R. 3280.309 (a) requires that the following notice be "prominently displayed in a temporary manner in the kitchen . . .":

#### Important Health Notice

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

ing is part of the federal standard. 42 U.S.C. 5403(d) preempts nonidentical state construction and safety standards. The Wisconsin formaldehyde warning requirement in sec. Ind 14.03(10)(b) is preempted.[11]

E. *Preemption Partial*

DILHR contends that, in any event, the state standard applies to the sale of mobile homes manufactured between the time the Wisconsin standard became effective, October 1, 1981, and the effective date of the federal standard, February 11, 1985. Appellants did not respond to this argument. Between those dates no federal standard purported to preempt state regulation and no federal standard existed to protect mobile home consumers. The state's enforcement of its standard was enjoined pending resolution of this appeal. DILHR asserts that during this appeal DILHR has been unable to process complaints of Wisconsin consumers or invoke the dispute resolution process unique to the Wisconsin rule. Consequently, DILHR argues that it should be able to process the complaints of Wisconsin consumers who purchased mobile homes before the effective date of the federal standard. We agree.

Wis. Adm. Code sec. Ind 14.03 was not preempted until the federal standards became effective. 42 U.S.C. secs. 5403(d), 5422(a). Since no federal standards were in effect on October 1, 1981, the original version of sec. Ind 14.03 was valid from October 1, 1981 to April 30, 1982, and the present version of that rule was in effect from May 1, 1982 to February 11, 1985.

*By the Court.*—Judgment modified to provide that Wis. Adm. Code sec. 14.03 is valid through February 10, 1985 and invalid by reason of Article VI of the United States Constitution from and after February 11, 1985.

---

[11] As a matter of common sense, DILHR's warning to consumers that the formaldehyde concentrations "in this mobile home are regulated by" DILHR cannot stand when DILHR's regulations themselves are preempted by federal law and regulations.